# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOEL NEAVE,

                **Plaintiff,**

    **v.**                                   **Case No. 07-C-301**

**MICHAEL ASTRUE,**
**Commissioner of the Social Security Administration,**
                **Defendant.**

## DECISION AND ORDER

        Plaintiff Joel Neave applied for social security disability benefits, claiming that he was unable to work due to a back injury and depression. The Social Security Administration ("SSA") denied his application, as did an Administrative Law Judge ("ALJ") after a hearing. The Appeals Council then denied his request for review, leaving the ALJ's decision as the final decision of the SSA on plaintiff's application. See Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007). Plaintiff now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A.    Judicial Review

        The court's task on judicial review is limited to determining whether the ALJ's decision is "supported by substantial evidence and based on the proper legal criteria." Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004) (internal quote marks omitted). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether the claimant is

disabled, the responsibility for that decision falls on the ALJ. <u>Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir. 1997). However, in order to take advantage of this deferential standard, the ALJ's decision must demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. While the ALJ need not evaluate in writing every piece of evidence, his decision also must be sufficient to assure the court that he considered the important evidence. <u>Rohan v. Chater</u>, 98 F.3d 966, 971 (7th Cir. 1996). Even if the evidence in the record supports the decision, the court cannot uphold it if the ALJ failed to build an accurate and logical bridge between the evidence and the result. <u>Sarchet v. Chater</u>, 78 F.3d 305, 307 (7th Cir. 1996). Likewise, if the ALJ commits an error of law, the court "may reverse without regard to the volume of evidence in support of the factual findings." <u>White v. Apfel</u>, 167 F.3d 369, 373 (7th Cir. 1999). The ALJ commits such an error if he fails to comply with the SSA's regulations and rulings for evaluating disability claims. <u>See</u> <u>Prince v. Sullivan</u>, 933 F.2d 598, 602 (7th Cir. 1991).

**B.  Disability Standard**

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently engaged in substantial gainful activity ("SGA")[1]; (2) if not, whether the claimant has a severe impairment or combination of impairments;[2] (3) if so, whether any of the claimant's impairments

---

[1]"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, for pay or profit. 20 C.F.R. § 404.1572.

[2]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

2

are listed by the SSA as being presumptively disabling;[3] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work;[4] and (5) if not, whether the claimant is able to perform any other work.  Skinner v. Astrue, 478 F.3d 836, 844 n.1 (7th Cir. 2007).

The claimant carries the burden of proof at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy.  Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001).  The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience.  However, the ALJ may not rely on the Grid and must consult a VE if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work.  E.g.,  Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II.  FACTS AND BACKGROUND

### A.    Plaintiff's Work History, Injury and Social Security Application

Plaintiff began working as a chipper/grinder at a foundry in 1979.  On January 17, 2000, he injured his back lifting a piece of steel and missed work for about four months before

---

[3]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

[4]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments.  SSR 96-8p.

3

returning in a part-time, light duty capacity, sweeping and cleaning bathrooms. In January 2001, plaintiff's doctor cleared him for full-time light duty. He worked full-time in the light duty cleaning job from January 5, 2001 through March 2002, when he was again reduced to part-time hours. Plaintiff worked about twenty-four hours per week until July 15, 2002, when his employer laid him off permanently. (Tr. at 41; 54-55; 306-07.)

Plaintiff applied for social security benefits on December 11, 2002, alleging a disability onset date of July 15, 2002. (Tr. at 45.) In accompanying reports, plaintiff indicated that he could not speak, read or write English (Tr. at 72) and had a third grade education (Tr. at 79). He indicated that he was unable to work due to constant low back pain, which limited his ability to lift and bend, and that he believed his employer laid him off due to his back problems and restrictions. (Tr. at 73; 87; 91.) He wrote that his past work as a chipper/grinder required him to stand and walk eight hours per day and lift up to twenty-five pounds frequently, up to fifty pounds occasionally. (Tr. at 74.)

In a separate report, plaintiff's wife wrote that he had difficulty bathing, tying his shoes and cutting his toe nails due to his condition, and spent most of his time at home. (Tr. at 99; 102.) She wrote that he was no longer active due to his back pain (Tr. at 99), had become depressed since his injury and tended to isolate himself (Tr. at 100; 102). Plaintiff's county benefits specialist also completed a report, in which she indicated that plaintiff was in pain, depressed and isolated himself. She stated that he tried to help with the cooking but did little else around the house and engaged in no hobbies or activities. (Tr. at 105; 107.) She also wrote that plaintiff's memory was poor, and he often forgot what he was saying or where he put things. (Tr. at 108.)

The SSA denied plaintiff's claim initially (Tr. at 25; 27) and on reconsideration (Tr. at 26;

4

31).  Plaintiff requested a hearing (Tr. at 35), and on October 5, 2005 he appeared with counsel before ALJ Robert Bartelt (Tr. at 36).

**B.      Hearing Testimony**

Plaintiff testified, through an interpreter, that he was born in Mexico and left school in the fourth grade to help his father work.  He stated that he could not read or write in English and just a little in Spanish.  (Tr. at 317-18.)  He indicated that after he hurt his back at work he received various forms of treatment, but no longer saw a doctor because he did not have insurance.  He indicated that in lieu of treatment he stood up, walked around, laid down and used ice to relieve the pain.  (Tr. at 321.)  He indicated that his pain had worsened in the past year.  (Tr. at 322.)  He also stated that he felt sad and cried because he could not work, and that he took medication for depression.  (Tr. at 322.)  Plaintiff testified that he was able to cook and do some light cleaning, but that he was no longer able to work, play pool or go dancing with his wife.  (Tr. at 324.)  Plaintiff's wife testified that he had been depressed, tearful, at times suicidal, and did not tend to his personal hygiene.  (Tr. at 330.)  The ALJ did not summon a VE to the hearing.

**C.      Medical Evidence**

**1.      Treatment Records**

Following his back injury in January 2000, plaintiff treated with Drs. Foster and Noonan, participating in physical therapy and work hardening.  (Tr. at 135.)  On August 31, 2000, plaintiff saw Dr. James Stoll, who, after conducting further tests, did not recommend surgery but instead referred plaintiff to the Columbia Hospital pain management program.  (Tr. at 135.)  In October 2000, plaintiff advised the Columbia pain physician, Dr. James Lincer, that he

5

experienced significant low back pain, radiating down the left leg. He also reported feeling depressed and irritable with low energy. (Tr. at 135.) Dr. Lincer diagnosed chronic pain syndrome with depression, anxiety and somatization (Tr. at 137), chronic low back pain, and significant anxiety and depression (Tr. at 138). Dr. Lincer noted that plaintiff may benefit from steroidal injections, as anti-inflammatory medicines had not helped. He found plaintiff to be a good candidate for pain management, recommending a full-time six week program. (Tr. at 138.)

Plaintiff was also evaluated by John Galbraith, Ph.D., for the Columbia chronic pain management program. Plaintiff reported doing little around the house, but walked about thirty minutes per day and was able to complete most self-care without assistance. On examination, plaintiff's mood was depressed and his affect mildly restricted. He did display pain behaviors such as standing periodically. Plaintiff described his mood as down, frustrated and at times angry, with frequent crying spells. (Tr. at 140.) He also reported recent difficulty with attention, concentration and short-term memory. Dr. Galbraith noted that plaintiff's MMPI-2 test profile was probably invalid, which may reflect lack of motivation or negativism. He wrote: "It is quite likely that this patient has exaggerated existing symptoms and malingering or an attempt to obtain secondary gain must be considered." (Tr. at 141.) Plaintiff scored 38 on the Beck Depression Inventory, consistent with severe levels of depression, and 34 on the Beck Anxiety Inventory, consistent with severe levels of anxiety. (Tr. at 142.) Dr. Galbraith concluded that plaintiff met the criteria for participation in the inter-disciplinary chronic pain management program (Tr. at 143) and recommended physical and occupational therapy, along with pain/stress management and possible anti-depressant medication (Tr. at 144).

On October 23, 2000, Dr. Lincer administered a left sacroiliac joint injection, and plaintiff

6

noted 100% resolution of his pain in this region within ten minutes after the procedure. (Tr. at 132.) Plaintiff then attended the Columbia pain management program from November 27, 2000 through January 5, 2001, reporting improvement in sleep and mood with prescribed medications. A December 14, 2000 MRI revealed no disc herniation or spinal stenosis. At the time of discharge, plaintiff reported his pain at 66% of its pre-treatment level. (Tr. at 130.) Dr. Lincer noted that plaintiff did not appear to place much value in relaxation and pain management techniques but was generally cooperative in treatment. Plaintiff also put forth good effort in physical therapy, although it varied with pain intensity. He made modest gains in strength, flexibility and endurance. (Tr. at 131.) Dr. Lincer released plaintiff to work full-time on January 5, 2001, with permanent restrictions of lifting up to twenty pounds occasionally, fifteen pounds frequently, three-quarter squat, and pushing a ninety pound cart 1350 feet. (Tr. at 155.)

Plaintiff returned to Columbia for an out-patient follow-up on March 29, 2001, reporting some pain at work and difficulty sleeping. (Tr. at 127.) On May 31, 2001, he appeared to be doing fairly well. He reported a pain flare up at work but stated that he was able to work through it. His mood was okay, and he reported no side effects of medication. (Tr. at 128.) On November 29, 2001, plaintiff reported that things were basically the same as in May. His mood and sleep remained good, but he was somewhat apprehensive that he would be asked to exceed his restrictions at work. (Tr. at 126.) On May 30, 2002, plaintiff again reported that things were basically the same, but he did complain of some increased low back pain so Dr. Lincer scheduled a follow-up MRI. (Tr. at 125). The MRI, taken on June 6, 2002, revealed L4-5 disc bulging with mild to moderate spinal stenosis, which appeared to have progressed since the previous study in December 2000. The MRI also revealed degeneration and disc bulging

7

at L5-S1, findings which were relatively stable since the previous study. The remainder of the disc levels were maintained. (Tr. at 149-50.)

Plaintiff returned to Dr. Lincer on June 17, 2002, who noted that plaintiff's recent MRI revealed some progression with increased disc material centrally at L4-L5. Plaintiff complained of increased low back pain extending down the left leg. He stated that his pain was worse since he finished the pain management program and went back to work in January 2001 on light duty. (Tr. at 122.) On examination, plaintiff appeared depressed and anxious, and he ambulated with a slow and guarded gait. He demonstrated fairly good range of motion but with complaints of pain on all movements. (Tr. at 124.) Dr. Lincer's impression was increased disc protrusion at L4-L5 causing moderate stenosis and possible lumbar radiculopathy. He scheduled plaintiff for steroid injections at Kenosha Memorial Hospital (Tr. at 124), and later prescribed Neurontin (Tr. at 121) and conducted electro-diagnostic studies, which revealed mild left L5 radiculopathy (Tr. at 119). On June 26, 2002, Dr. S. Aschenbrener administered an epidural steroid injection at the L4-L5 level. (Tr. at 145.) Plaintiff returned on July 10, 2002, noting two days of significant diminution of symptoms but minimal improvement otherwise, so Dr. Aschenbrener administered a second epidural. (Tr. at 148.)

On July 17, 2002, plaintiff advised Dr. Lincer that he was feeling good since the second epidural with no leg symptoms. He was tolerating the Neurontin well with no side effects. Dr. Lincer continued plaintiff on Neurontin and noted that he may want to cancel his scheduled third epidural if he remained asymptomatic. (Tr. at 117.) On September 5, 2002, plaintiff reported that he had decided not to have the third epidural as he had remained asymptomatic. He reported no leg pain, his back was feeling very good, and his mood and affect were bright. (Tr. at 116.)

8

However, on November 11, 2002, plaintiff's wife called Dr. Lincer's office and reported that the pain was worse again, and plaintiff wanted to have the third epidural. On December 16, 2002, Dr. Lincer's nurse noted that the last injection only worked for three days.[5] Plaintiff's wife also reported that he was depressed and not sleeping well. (Tr. at 173.)

On November 15, 2002, Charles McReynolds completed a loss of earning capacity evaluation in connection with plaintiff's workers' compensation claim. (Tr. at 152.) Plaintiff indicated that aside from his job at the foundry his only other work experience was as a migrant field worker. (Tr. at 158-59.) Based on plaintiff's inability to return to his medium-heavy work as a chipper/grinder or farm worker, and his inability to communicate in English and functional illiteracy, McReynolds opined that plaintiff's employment opportunities would be severely limited and estimated a loss of earning capacity of 40 to 50%. (Tr. at 159-61.)

Plaintiff returned to Dr. Lincer on December 18, 2002, complaining of back pain, and the doctor ordered another MRI. (Tr. at 172.) The December 23, 2002 MRI revealed a stable lumbar spine with desiccation, bulging and posterior annular tear of the L4-L5 disc, with no herniated disc or stenosis. (Tr. at 147.)

On February 2, 2003, plaintiff met with a case worker at the state Division of Vocational Rehabilitation ("DVR"), who concluded, based on his light duty restrictions, illiteracy and inability to communicate in English, that plaintiff was unemployable and should apply for social security disability. She further noted that plaintiff was uninsured and unable to make payments under COBRA. (Tr. at 227-28.)

On June 5, 2003, plaintiff saw Dr. Maher Maroud at the Kenosha Community Health

---

[5]It is unclear whether the nurse was referring to a third epidural, which the transcript does not otherwise record.

9

Center (apparently a facility for low income, uninsured individuals) about his back. He reported that he was no longer able to see Dr. Lincer "because of financial problems." (Tr. at 251.) He complained of low back pain radiating into his left leg with numbness. Plaintiff also reported a history of depression and was scheduled to see a psychiatrist, Dr. Ashok Shah, the following week. Dr. Mourad provided Vioxx for pain. (Tr. at 251-52.)

On June 13, 2003, Dr. Shah examined plaintiff, finding him to be alert, oriented and in no acute distress, but with depressed mood and affect. His concentration was poor, his judgment and insight fair, his memory intact, and his general fund of knowledge average. (Tr. at 298.) Dr. Shah diagnosed depression NOS ("not otherwise specified"), rule out recurrent major depression, with a GAF of 60,[6] and prescribed medications including Effexor. (Tr. at 299.)

Plaintiff returned to Dr. Shah on July 25, 2003, stating that he was "doing okay" since he started on Effexor. His depression was under control, and his wife stated that she had seen an improvement. Dr. Shah continued plaintiff's medications. (Tr. at 297.)

On September 19, 2003, plaintiff advised Dr. Shah that he was doing "pretty well." His depression was under control, and he occasionally smiled. He reported no side effects from medication, and his sleep was improving. (Tr. at 296.)

On November 14, 2003, plaintiff told Dr. Shah he was having trouble sleeping and occasionally felt depressed and isolated. On mental status exam, plaintiff's mood was mildly sad. Dr. Shah assessed increased depression and insomnia, and increased plaintiff's Effexor

---

[6]GAF ("Global Assessment of Functioning") is an assessment of the person's overall level of functioning. Set up on a 0-100 scale, a score of 60 denotes moderate symptoms. Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

dosage. (Tr. at 295.)

On January 8, 2004, plaintiff returned to Dr. Shah, stating that he was doing much better on the increased Effexor. He did report some upset stomach and dry mouth with the medications. Dr. Shah assessed improving depression and continued plaintiff's medications. (Tr. at 294.) Plaintiff continued to complain of medication side effects on March 4, 2004 but otherwise reported no major problems. (Tr. at 293.)

Plaintiff saw Dr. Shah again on April 29, 2004, stating that his side effects had diminished with decreased Effexor use. He was anxious and nervous about his pending social security application, and stated that he could not do anything physically because of his back. He reported feeling frustrated from time to time, but otherwise reported no major problems. (Tr. at 292.)

On June 24, 2004, plaintiff told Dr. Shah he had been having a lot of pain, and occasionally got frustrated, tearful and sad. He reported trying to exercise as much as possible so his back did not get stiff. He stated that he was taking Vioxx, but the medicine did not help as much as it used to. Dr. Shah assessed stable depression with chronic pain and continued plaintiff's medications. (Tr. at 291.)

On August 17, 2004, plaintiff reported doing pretty well since his last visit. He stated that he cooked and tried to help his wife as much as possible around the house. Dr. Shah reported that plaintiff's depression was under control. (Tr. at 290.) On October 19, 2004, plaintiff reported backache due to the weather and stated that he could not stand or sit for long. Dr. Shah indicated that he was reasonably stable. (Tr. at 289.)

On February 8, 2005, plaintiff stated that he was doing okay but still had a lot of back pain and could not do anything more than light work. He occasionally felt depressed over his

11

financial situation. On mental status exam, Dr. Shah noted blunt affect and depressed mood, and continued plaintiff's medications. (Tr. at 288.)

On April 5, 2005, plaintiff's wife reported that they had moved into a trailer park, and plaintiff tried to help but his back problems prevented him from doing much. He occasionally got depressed and did not want to take care of his personal care, such as shaving. (Tr. at 287.)

On May 31, 2005, plaintiff reported that his back problems persisted, but his depression was under control. Dr. Shah continued his medications. (Tr. at 286.) However, on July 25, 2005, plaintiff reported feeling more depressed, crying and worrying excessively about not being able to do anything. Dr. Shah assessed increased depression with back pain and social stressors, and increased plaintiff's Effexor. (Tr. at 285.)

On September 19, 2005, Dr. Shah prepared a report in which he listed plaintiff's diagnosis as depression NOS with a current GAF of 70.[7] (Tr. at 300.) As clinical findings, he listed sadness and reduced energy related to physical pain. (Tr. at 301.) He opined that plaintiff would be absent more than three times per month due to his impairments, and that plaintiff's ability to complete a normal work day without interruptions from psychological symptoms, perform at a consistent pace, deal with normal work stress, be aware of hazards and adhere to basic standards of neatness was poor. (Tr. at 303-04.) He related these limitations to plaintiff's depression, reduced concentration and back pain. (Tr. at 304.) Dr. Shah further noted marked restrictions in plaintiff's activities of daily living; moderate restrictions of social functioning and concentration, persistence and pace; and repeated episodes of

---

[7]A score of 70 denotes mild symptoms. Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

decompensation.[8]  (Tr. at 305.)

### 2.    SSA Consultants' Reports

After plaintiff filed his application, the SSA arranged for his claim to be evaluated by several consultants.  On January 22, 2003, Dr. Michael Baumblatt reviewed plaintiff's file and completed a physical RFC assessment, concluding that plaintiff retained the RFC for light work (i.e., lifting up to ten pounds frequently, twenty pounds occasionally, and standing/walking six out of eight hours), with no additional limitations.[9]  (Tr. at 202-09.)  On January 23, 2003, Jack Spear, Ph.D., completed a psychiatric review technique form for the SSA, concluding that plaintiff had no severe mental impairment.  (Tr. at 210; 220.)

On June 4, 2003, plaintiff underwent a consultative psychological exam with Gregory Rudolph, Ph.D., at the behest of the SSA.  Dr. Rudolph diagnosed depression, moderate, secondary to medical condition; generalized anxiety disorder; and a GAF of 55.[10]  (Tr. at 240-41.)  On mental status exam, plaintiff presented as somber with a moderate degree of dysphoria, but with no unusual thought disturbances or confusion in thought processes.  (Tr. at 242.)  His memory was appropriate but his knowledge of general information limited.  His ability to use judgment was adequate, but he had some difficulty with basic reasoning skills. (Tr. at 243.)

Finally, on July 14, 2003, consultant Keith Bauer, Ph.D., completed a psychiatric review technique form, concluding that plaintiff had a severe mental impairment, i.e. depression and

---

[8]Based on these findings, plaintiff met Listing 12.04 for affective disorders.

[9]A second consultant, whose signature is illegible, completed a physical RFC report in July 2003, also opining that plaintiff could perform light work.  (Tr. at 259-66.)

[10]Such a score reflects "moderate" symptoms.  DSM-IV at 32-34.

13

generalized anxiety disorder, but that these conditions produced only mild to moderate limitations. (Tr. at 271-81.) In a mental RFC report, Dr. Bauer opined that plaintiff was moderately limited in some work-related areas, not significantly limited in others. (Tr. at 267-69.)

## D. ALJ's Decision

On April 26, 2006, the ALJ issued an unfavorable decision. He concluded that plaintiff had not engaged in SGA since his alleged onset date and was "severely impaired," but that his impaired condition did not meet or equal any Listing.[11] (Tr. at 18.) Rejecting plaintiff's claims of disabling pain and mental limitations, the ALJ concluded that plaintiff retained the RFC for "a wide range of routine, unskilled, light work." (Tr. at 18.) Given that RFC, the ALJ ruled that plaintiff could return to his past work as a cleaner. In the alternative, the ALJ concluded that plaintiff's claim failed at step five under Grid Rule 202.16. Accordingly, he found plaintiff not disabled and denied his application. (Tr. at 18-20.)

Plaintiff asked the Appeals Council to review the ALJ's decision (Tr. at 9), but the Council denied the request on January 23, 2007 (Tr. at 5). This action followed.

## III. DISCUSSION

In this court, plaintiff argues that the ALJ erred in (1) assessing his RFC and ability to return to past work at step four, (2) determining the credibility of his testimony and (3) evaluating the treating source report of Dr. Shah. He asks for a judicial award of benefits or in the alternative remand for a new hearing before a different ALJ.

---

[11]The ALJ did not specify what plaintiff's severe impairment was; presumably, he meant plaintiff's back condition only, as he concluded that plaintiff had no significant work-related mental limitations. (Tr. at 18.)

14

**A.      RFC/Step Four Determination**

**1.      Legal Standard**

At step four of the sequential evaluation process, the ALJ must determine whether the claimant has the RFC to perform his past work. This determination is comprised of three phases. Blom v. Barnhart, 363 F. Supp. 2d 1041, 1057 (E.D. Wis. 2005) (citing Gotz v. Barnhart, 207 F. Supp. 2d 886, 896 (E.D. Wis. 2003)).

First, the ALJ must evaluate the claimant's RFC. Id. RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant. Exertional capacity refers to the claimant's abilities to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling. Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. The ALJ must also explain how he resolved any material inconsistencies or ambiguities in the evidence. Patterson v. Barnhart, 428 F. Supp. 2d 869, 885-86 (E.D. Wis. 2006) (citing SSR 96-8p). RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past work as he actually performed

15

it. Thus, the ALJ must separately assess the claimant's ability to perform each of the seven strength demands. Blom, 363 F. Supp. 2d at 1057.

Second, the ALJ must identify the claimant's past relevant work and determine the physical and mental demands of such work. In this context, past work can mean two things: (1) the actual functional demands of the particular job that the claimant performed, or (2) the functional demands and job duties of such an occupation as it is generally found in the national economy. Id.

Third, the ALJ must determine whether the claimant has the ability to meet the job demands found in phase two despite the mental or physical limitations found in phase one. This involves comparing the claimant's past relevant work with his present mental and physical capacity. Additionally, to justify a finding that the claimant is able to return to his past relevant work the record must establish that he could do so on a sustained basis. Id. In making this determination, the ALJ cannot simply describe a claimant's job in a generic way, e.g. "sedentary" or "light," and "conclude, on the basis of the claimant's residual capacity, that [he] can return to [his] previous work. Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991) (citing Strittmatter v. Schweiker, 729 F.2d 507, 509 (7th Cir. 1984)); see also Delgado v. Bowen, 782 F.2d 79, 83 (7th Cir. 1986) ("Mere categorization of the work and the claimant's capacities is not enough; particulars of the job and the claimant's capacities must be considered.").

## 2. Analysis

In the present case, the ALJ concluded that plaintiff's past relevant work was unskilled in nature and consisted of "light" work as a cleaner and "heavy" work as a chipper/grinder. He

16

further indicated that although plaintiff had been reduced to part-time work during portions of 2001 and 2002, his earnings in the cleaner position remained at the "substantial gainful" level until his alleged disability onset date. (Tr. at 17.) The ALJ then determined that, so long as he maintained his established treatment regimen, plaintiff had no significant work-related mental limitations and otherwise retained the RFC for a wide range of routine, unskilled light work. Given that RFC, the ALJ concluded that plaintiff "should be able to return to his past relevant light work as a cleaner." (Tr. at 18.) In the alternative, the ALJ concluded that even if plaintiff could not return to past work, he was nevertheless able to perform a variety of other light jobs under Grid Rule 202.16, which directed a finding of not disabled. (Tr. at 18.)

The ALJ erred at each phase of the step four evaluation. First, the ALJ failed to assess plaintiff's exertional abilities on a function-by-function basis. Instead, he simply concluded that plaintiff could perform "light work."[12] See SSR 96-8p ("The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis[.] Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."). Further, the ALJ concluded that plaintiff had no mental or other non-exertional limitations, without addressing the report of consulting psychologist Dr. Bauer, who opined that plaintiff had a severe mental impairment and was moderately limited in various work-related abilities. (Tr. at 267-68; 271.) According to SSR 96-6p, ALJs "may not ignore these opinions and must explain the weight

---

[12]The Commissioner contends that substantial evidence, including the opinions of Dr. Lincer and the SSA consultants, supported the ALJ's conclusion that plaintiff could perform light work. However, this does not excuse the ALJ's failure to comply with SSR 96-8p. See Schoenfeld v. Apfel, 237 F.3d 788, 796 (7th Cir. 2001) (stating that if the ALJ commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings).

17

given to these opinions in their decisions."[13]

Second, the ALJ failed to explain his finding that plaintiff's "cleaner" position qualified as "past relevant work." Past work constitutes relevant work experience for purposes of step four analysis when it (1) was done within the last fifteen years, (2) lasted long enough for the claimant to learn to do the job, and (3) was substantial gainful activity. 20 C.F.R. § 404.1565(a); see also SSR 82-62 (explaining that past relevant work must be (1) "substantial" and "gainful," (2) performed for a duration sufficient for the worker to have learned the techniques, acquired information, and developed the facility needed for average performance in the job situation, and (3) performed recently, generally within the past fifteen years). However, SSR 83-33 explains that even if these conditions are met the ALJ must consider the possibility that the employer, "because of a benevolent attitude toward a handicapped individual, subsidize[d] the employee's earnings by paying more in wages than the reasonable value of the actual services performed."

In the present case, the record contains substantial evidence that plaintiff's employer may have subsidized him in the light duty cleaner position. Plaintiff worked in the foundry from 1979 to 2000, when he hurt his back. His employer allowed him to return to work, at the same pay rate ($11.75/hour), sweeping and tending to the bathrooms. The employer also accommodated plaintiff's part-time restrictions from March 2002 until his termination in July 2002. The ALJ found that plaintiff's wages in 2001 and 2002 remained at the SGA level, and

---

[13]The ALJ also stated that Dr. Rudolph's report revealed no restrictions on plaintiff's ability to perform unskilled work. However, Dr. Rudolph did diagnose depression with a GAF of 55, denoting moderate symptoms. (Tr. at 240-43.) This report does not support the ALJ's conclusion that plaintiff had no mental limitations. Further, as I will discuss in section C. of this decision, the ALJ totally rejected the report of plaintiff's psychiatrist, Dr. Shah, without considering all of the relevant factors under SSR 96-2p and 20 C.F.R. § 404.1527.

18

substantial evidence appears to support that determination. In his brief, the Commissioner also notes that plaintiff performed this job for more than few months, a sufficient period of time to satisfy the durational requirements of past relevant work. But the ALJ failed to consider the distinct possibility that the employer subsidized plaintiff's wages during this time, paying him at the chipper/grinder rate although his actual duties appeared to be minimal. The Commissioner also fails to address this issue in his brief.[14]

Even if plaintiff's "cleaner" job qualified as past relevant work, the ALJ failed to determine the specific demands and duties of that position. The ALJ stated that this work was "light" (Tr. at 17), but he cited no evidence in support of that determination and included no further discussion of the requirements or duties of plaintiff's particular job.[15] See Quigley v. Barnhart, 224 F. Supp. 2d 357, 369-70 (D. Mass. 2002) (reversing where the ALJ failed to develop the record and determine with specificity the duties of the claimant's former jobs). An ALJ cannot reasonably conclude that a claimant can return to his past work without engaging in any analysis of what that job entails.

---

[14]The ALJ also stated that plaintiff admitted that he left work at the foundry because he was laid off, not because of an inability to do the work. (Tr. at 17.) However, the record does not appear to support this claim. Plaintiff testified that "they sent me a letter and they told me not to return to work." (Tr. at 326.) In his disability report, plaintiff wrote that his employer laid him off "due to health." (Tr. at 73.) In his physical activities questionnaire, plaintiff wrote "because of my back, can't do much work so I think that's why I got laid off." (Tr. at 91.) Plaintiff advised loss of earning capacity evaluator McReynolds that he believed his dismissal was related to his functional limitations. (Tr. at 158.) The ALJ must also revisit this issue, which relates to the subsidy issue, on remand. It may be that the cleaner job was simply a temporary employer accommodation, which ended when it became clear that plaintiff lacked the ability to return to his "real" job as a chipper/grinder.

[15]SSR 82-62 provides that the "claimant is the primary source for vocational documentation." Here, the ALJ failed to solicit from plaintiff at the hearing a detailed description of the duties of the cleaner position; more importantly, the ALJ did not list those duties in his decision.

19

Nor did the ALJ evaluate the "cleaner" job as it is generally found in the national economy; indeed, the record contains no evidence from a reliable source such as a VE or the Dictionary of Occupational Titles ("DOT") as to what the requirements of a generic "cleaner" job might be.  See SSR 82-62 (stating that the ALJ may obtain supplementary or corroborative information from sources such as the DOT "on the requirements of the work as generally performed in the economy"); compare Brinegar v. Barnhart, 358 F. Supp. 2d 847, 858 (E.D. Mo. 2005) (upholding the ALJ's reliance on the DOT description of the claimant's past work), and Urban v. Sullivan, 799 F. Supp. 908, 922 (C.D. Ill. 1992) (upholding step four determination of past work based on VE testimony and the DOT), with McKinney v. Bowen, No. 87 C 5734, 1988 U.S. Dist. LEXIS 6813, at *5-6 (N.D. Ill. July 5, 1988) (reversing where "nothing in the ALJ's opinion shows that he compared McKinney's RFC to her past occupations as he found them to be performed in the national economy").

Third, the ALJ failed to "list the specific physical requirements of the previous job and assess, in light of the available evidence, [plaintiff's] ability to perform these tasks." Nolen, 939 F.2d at 518.  Instead, he committed the same error as in Nolen, describing plaintiff cleaner job in a generic way and concluding, on the basis of plaintiff's RFC, that he could return to his previous work.  Id.  Therefore, for all of these reasons, the matter must be remanded for re-consideration at step four.

**B.    Credibility**

**1.    Legal Standard**

Generally, the court must defer to an ALJ's credibility determination because he had the opportunity to personally observe the claimant's demeanor at the hearing.  Windus v. Barnhart,

20

345 F. Supp. 2d 928, 945 (E.D. Wis. 2004). Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). However, when the ALJ bases his credibility determination on objective factors or fundamental implausibilities rather than subjective considerations such as a claimant's demeanor, courts have greater freedom to review the ALJ's decision. Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ must also sufficiently articulate the reasons for his credibility determination. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003). A mere recitation of the testimony followed by a conclusory statement that the claimant's allegations have been considered, or are (or are not) credible will not do. Giles, 483 F.3d at 488-89. Finally, the ALJ must comply with the requirements of SSR 96-7p in evaluating credibility. Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).

SR 96-7p establishes a two-step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. SSR 96-7p.

Second, if an underlying impairment that could reasonably be expected to produce the claimant's symptoms has been shown, the ALJ must determine the extent to which the claimed symptoms limit the claimant's ability to work. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96-7p. The "ALJ may not disregard subjective complaints merely because they are not fully supported by objective

21

medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).  Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication the claimant takes; treatment other than medication; any other measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  While the ALJ need not elaborate on each of these factors when making a credibility determination, he must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Windus, 345 F. Supp. 2d at 946.

> **2. Analysis**

In the present case, the ALJ made no express finding on the credibility of plaintiff's testimony.  Instead, he wrote that plaintiff did not suffer from pain or other symptoms that could be considered disabling under the 20 C.F.R. § 404.1529 standard.  As in Peterson v. Chater, 96 F.3d 1015, 1016 (1996), this was not really a credibility determination to which I must defer but rather a conclusion on plaintiff's ability to work.  In any event, the reasons supplied by the ALJ in support of his finding were flawed.  The ALJ stated that (1) plaintiff was asymptomatic by July 2002, had no recent back treatment and was not taking prescription pain medications; (2) plaintiff's depression was effectively managed with his current treatment regimen; (3) plaintiff was able to perform light duty work before being laid off; (4) plaintiff received unemployment benefits after being laid off (thus holding himself out as being able to work); and (5) despite claiming that he "can't do anything," plaintiff engaged in various daily activities such as managing self-care, cooking, cleaning, driving, shopping, walking, visiting neighbors, helping

22

with volunteer activities, watching TV and performing small household repairs. (Tr. at 17; 18.)

These findings – all based on objective considerations rather than demeanor – were problematic in several respects. First, the ALJ relied on plaintiff's lack of treatment without considering any explanation plaintiff may have to justify it. SSR 96-7p states:

> The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

At the hearing, plaintiff explained that he no longer saw a doctor for his back because he did not have insurance. (Tr. at 321.) Similarly, in his reconsideration request he wrote that he was supposed to see Dr. Lincer on March 6, 2003, but the doctor refused to treat him any longer because he did not have insurance. (Tr. at 95.) In June 2003, plaintiff likewise told Dr. Maroud that he was no longer able to see Dr. Lincer "because of financial problems." (Tr. at 251.) The state DVR evaluator also indicated that plaintiff was uninsured and could not afford to make payments under COBRA. (Tr. at 227-28.) Courts have regularly held that inability to afford treatment constitutes a good reason for not seeking it. See, e.g., Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547 (3d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 133 (2d Cir. 2000); Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995); Caviness v. Apfel, 4 F. Supp. 2d 813, 819 (S.D. Ind. 1998). The ALJ failed to consider this evidence.

Second, the ALJ failed to consider medical evidence contradicting his finding that plaintiff was asymptomatic by June 2002 and thereafter. Plaintiff's June 6, 2002 MRI demonstrated "progression with increased disc material centrally at L4-L5." (Tr. at 122; see also Tr. at 149.) Dr. Lincer's notes from the fall of 2002 reveal that plaintiff complained of worsening pain (Tr. at 173), and another MRI taken on December 23, 2002 revealed a

23

"posterior annular tear of the L4-L5 disk" (Tr. at 147). The ALJ also failed to consider the evidence of plaintiff's treatment with Dr. Mourad of the Kenosha Community Health Center in the summer of 2003. (Tr. at 250-51.) Dr. Mourad prescribed Vioxx for pain (Tr. at 252), another fact the ALJ ignored. Plaintiff advised Dr. Shah of his continued Vioxx use in June 2004, but complained that it was not helping as much as it used to. (Tr. at 291.) The ALJ skipped this evidence too.

Third, as discussed in the preceding section, the ALJ failed to consider whether plaintiff's cleaner position amounted to sheltered work, and whether plaintiff was terminated due to his restrictions rather than simply "laid off." If this position represented an accommodation offered by a charitable employer, plaintiff's ability to do it would not diminish the credibility of his claim of disability.

Fourth, under the circumstances of this case, the ALJ should not have held plaintiff's receipt of unemployment benefits against him without considering whether he was "forced into seeking employment by desperate financial straights." Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005). The record contains evidence that plaintiff was worried about his financial situation (Tr. at 288), and that despite filling out many employment applications he could not "get an interview because of the back problems" (Tr. at 285; see also Tr. at 320). Thus, while receipt of unemployment benefits may constitute a valid basis for questioning a social security claimant's credibility in some cases, the ALJ may not automatically assume that such a person really can work and is thus lying about being disabled. Cf. Wilder v. Apfel, 153 F.3d 799, 801 (7th Cir. 1998) (stating that "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job").

Fifth, the ALJ mis-characterized plaintiff's testimony as claiming that he "can't do

24

anything." In response to a question from his lawyer about his depression, plaintiff testified: "I feel sad. I cry because I cannot work, I cannot do anything." (Tr. at 322.) Plaintiff did not mean this literally; in context, he seemed to be saying that he felt bad because, after years of work, he now felt unproductive. In the balance of his testimony, plaintiff clearly stated what he could no longer do – work, have relations with his wife, use the toilet without pain, dress like he used to, play pool, go dancing – and what he still could do – clean a little bit, cook slowly, sweep around the kitchen. (Tr. at 323-34.) The ALJ's characterization of plaintiff's testimony was unfair. See Sarchet, 78 F.3d at 307-09 (reversing credibility determination based on misunderstandings and misstatements); Windus, 345 F. Supp. 2d at 945 (stating that "the court need not defer to a credibility determination based on a misunderstanding or one-sided view of the evidence"). The ALJ also failed to assess the credibility of plaintiff's wife's testimony, which corroborated plaintiff's claims.

Finally, the ALJ relied on what appear to be fairly limited daily activities without explaining how such activities were inconsistent with plaintiff's claim. See, e.g., Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004) (reversing where the ALJ failed to "consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"); Zurawski, 245 F.3d at 887 (reversing where the ALJ relied on fairly restricted activities and failed to explain how such activities were inconsistent with the claimant's complaints of pain); Mason v. Barnhart, 325 F. Supp. 2d 885, 903-05 (E.D. Wis. 2004) (reversing where the ALJ based his credibility determination activities such as performing self-care, driving, shopping, watching TV, cooking simple meals, and visiting with family and neighbors); see also Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) ("We have cautioned the Social Security Administration against placing

25

undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home.")

Therefore, the matter must be remanded for re-evaluation of plaintiff's credibility as well.[16]

## C.    Dr. Shah's Treating Source Report

### 1.    Legal Standard

Treating source opinions are entitled to special consideration in social security cases. Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001). If such an opinion is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques" and "'not inconsistent' with the other 'substantial evidence' in the individual's case record," the ALJ must afford it "controlling weight." SSR 96-2p. Even if the ALJ finds that the opinion does not meet the standard for controlling weight, he may not simply reject it. SSR 96-2p. Rather, he must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d).

### 2.    Analysis

In the present case, the ALJ afforded Dr. Shah's September 19, 2005 report no "determinative weight." (Tr. at 18.) In support of his conclusion, the ALJ indicated that Dr. Shah's treatment records, which indicated that plaintiff's depression was under control with medication and counseling, did not support the report, and that the report was inconsistent with

---

[16]The Commissioner fails to respond to plaintiff's credibility arguments in his brief.

26

plaintiff's admitted daily activities. The ALJ also noted that the MMPI-2 test administered by Dr. Galbraith in October 2000 revealed lack of motivation and the "possibility of secondary gain." (Tr. at 18.) Finally, the ALJ noted that Dr. Rudolph's evaluation did not reveal similar restrictions on plaintiff's ability to perform unskilled work. (Tr. at 18.)

Plaintiff complains that the ALJ failed to consider Dr. Shah's July 25, 2005 treatment note, which indicated that plaintiff's depression had increased. (Tr. at 285.) However, given that Dr. Shah's notes generally indicated that plaintiff was doing "pretty well" (Tr. at 296), "doing much better" (Tr. at 294) and "doing okay" (Tr. at 288), and that he responded well to treatment, I cannot conclude that it was unreasonable for the ALJ to find the report unsupported by the records and thus decline to give it controlling weight.

The ALJ's reliance on plaintiff's daily activities is more problematic, as he failed to specify how those activities contradicted Dr. Shah's report. The ALJ's reliance on a single line in Dr. Galbraith's October 2000 report – that "malingering or an attempt to obtain secondary gain must be considered" (Tr. at 141) – is also problematic. Dr. Galbraith accepted plaintiff into the Columbia pain management program, and the records from that program do not, so far as I can tell, contain additional suggestions of malingering. Further, as noted above, while Dr. Rudolph did not list specific restrictions, he did find that plaintiff suffered from severe depression with a GAF of 55. Finally, while the ALJ may have properly determined that Dr. Shah's report was not entitled to controlling weight because it was not well-supported by medically acceptable clinical and laboratory diagnostic techniques as recorded in the treatment notes, he failed to consider the other factors bearing on the opinion's weight under 20 C.F.R. § 404.1527(d).

Therefore, the matter must be remanded for reconsideration of Dr. Shah's report under

27

all of the factors set forth in SSR 96-2p and § 404.1527(d), even if it does not meet the test for controlling weight. As I discuss in the next section, the existence of non-exertional limitations is an important factor under the Grid in this case.

**D.    Remedy**

**1.    Legal Standard**

Ordinarily, when an ALJ errs, the appropriate remedy is to remand for further proceedings. Only if all essential factual issues have been resolved and the record clearly supports a finding of disability should the court order benefits. <u>Windus</u>, 345 F. Supp. 2d at 951; <u>see also</u> <u>Boiles v. Barnhart</u>, 395 F.3d 421, 427 (7th Cir. 2005).[17]

**2.    Analysis**

In the present case, plaintiff argues that I should order the SSA to grant his application for benefits. He first notes that, according to Dr. Shah, he meets Listing 12.04 for affective disorders. However, the ALJ declined to give this report controlling weight, and although I will require the ALJ to take another look at the report on remand under SSR 96-2p, I cannot conclude, as a matter of law, that the ALJ is required to accept Dr. Shah's conclusion on the Listing.

Second, plaintiff claims that the ALJ's finding at step four was erroneous, for the reasons previously discussed, and the ALJ's fallback conclusion under the Grid at step five was also flawed because the ALJ failed to consider possible non-exertional limitations, which would

_____

[17]In earlier cases, the Seventh Circuit suggested that the court could also award benefits if the agency displayed obduracy in complying with the law as set down by the court. <u>See, e.g.</u>, <u>Wilder</u>, 153 F.3d at 801. However, the court of appeals has since made clear that a judicial award is proper "only if all factual issues have been resolved and the record supports a finding of disability." <u>Briscoe v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005).

28

make reliance on the Grid improper.  See Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994) ("The use of the grid is inappropriate where the claimant's nonexertional impairments are so severe as to limit the range of work he can perform.").  Because the ALJ failed to properly determine plaintiff's RFC, including his exertional and non-exertional abilities, I agree that the present decision cannot be upheld under the Grid.  However, the result of this error is not a judicial award but rather remand for reconsideration of RFC and if necessary solicitation of the views of a VE.  See Gotz, 207 F. Supp. 2d at 903  ("The ALJ's failure to obtain sufficient evidence from a vocational or medical expert is an adjudicator making a mistake, not a party litigator failing to present evidence.  Therefore, the proper remedy for errors at step five is not usually an automatic award of benefits but rather a remand for further proceedings.") (internal citation and quote marks omitted).

Plaintiff contends that the vocational evaluation provided by Charles McReynolds in connection with his workers' compensation case is sufficient for me to award benefits, without remanding for VE testimony.  McReynolds opined that in light of his physical limitations, illiteracy and inability to speak English, plaintiff "has literally no employment opportunities." (Tr. at 161.)  The ALJ should on remand consider this report, see Schwabe v. Barnhart, 338 F. Supp. 2d 941, 959-60 (E.D. Wis. 2004) (collecting decisions remanding for consideration of vocational reports);[18] however, the SSA has its own regulations defining disability, and it is not required to accept evaluations conducted under other benefit programs such as workers'

---

[18]In this regard, the ALJ should also take a look at the state DVR evaluation, which indicated that plaintiff was unemployable and should apply for social security disability. (Tr. at 227-28.) Again, such reports from other agencies or sources on plaintiff's employability are not dispositive, but the ALJ should not ignore them.  See SSR 06-03p (stating that "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered").

29

compensation law. <u>See, e.g.</u>, <u>Gray v. Chater</u>, 903 F. Supp. 293, 301 n.8 (N.D.N.Y. 1995) ("The issue of disability for purposes of workers' compensation is different from the issue of disability for purposes of Social Security disability benefits and SSI benefits."); <u>see also</u> SSR 06-03p (stating that only the Commissioner can determine whether an individual is disabled under social security law).

In sum, not all material factual issues have been resolved, and the record does not compel a finding of disability. Therefore, the matter will be remanded for further proceedings.[19]

Finally, plaintiff asks that, if I remand the case, it be assigned to a different ALJ. Absent evidence of bias or partiality, I generally may not direct that the case be given to a different judge. <u>See</u> <u>Sarchet</u>, 78 F.3d at 309. I see no such evidence here. However, given the tone of the decision and the numerous errors it contained, I do suggest that the Commissioner assign the matter to a different ALJ on remand. <u>See</u> <u>Clifford</u>, 227 F.3d at 874.

### IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of August, 2007.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

_____

[19]Plaintiff notes that since the ALJ's decision he turned fifty, and under the Grid rule applicable to persons of such age he would be found disabled. The Commissioner counters that plaintiff should file a new application if he believes he became disabled after the ALJ's decision. The ALJ may on remand determine the effect, if any, of plaintiff's current age.

30